IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PERSON OF MICHAEL MISKE | Mag. No. 15-01449 BMK **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, AUSTIN KYLE JACKSON, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant authorizing the search of the following: the person of MICHAEL MISKE, who is a white male, date of birth February 15, 1974, Social Security Account Number 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, Hawaii driver's license number H00539783, six feet one inch tall, approximately 210 pounds, with brown hair and brown eyes, as more particularly described in Attachment "A" hereto.  The search of the above will be conducted for the items specified in Attachment "B" hereto, which items constitute evidence, fruits and instrumentalities of the violations listed hereafter.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been employed with the FBI since January 11, 2015 and was assigned as a Special Agent on May 29, 2015.  I am presently assigned to the Criminal Enterprise

Squad of the FBI's Honolulu Field Office where my duties include investigating Organized Crime, Money Laundering, Extortion and other major federal violations. I have participated in investigations which utilized telephone records to effectively identify subjects and gather evidence. During my instruction at the FBI Academy, Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. Prior to my assignment with the FBI, I was a police officer with the Fairfax County Police Department, Virginia in excess of five years where I investigated a number of state violations. Specifically, I participated in a number of short-term drug investigations, subsequently leading to arrests and convictions on behalf of the Commonwealth of Virginia. In addition, I was involved in the execution of numerous search warrants in relation to various criminal offenses. As a federal agent, your affiant is authorized to investigate violations of laws of the United States and is a law enforcement officer with the authority to execute search warrants issued under the authority of the United States.

3.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Michael MISKE (hereafter referred to

as MISKE), and others known and unknown, constituted an enterprise, that is, a group of individuals and entities associated as described in 18 U.S.C. §§ 1961(4); and that members and associates of this enterprise, including the subjects, committed the offenses of RICO and RICO Conspiracy, in violation of 18 U.S.C. §§ 1961 and 18 U.S.C. §§ 1962(d) by conducting and conspiring to conduct the affairs of the enterprise, which enterprise engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity consisting of dealing in a controlled substance, extortion and gambling, acts chargeable under Hawaii State law and activity indictable under 18 U.S.C. §§ 1951 (Interference of Commerce by Threats or Violence) and 18 U.S.C. §§ 1084 (Transmission of Wagering Information).

5.      There is also probable cause to search the person described in Attachment A for evidence, instrumentalities, contraband or fruits of this crime further described in Attachment B.

## SOURCES OF INFORMATION

### Confidential Informants (CIs)

6.      CI#1 was a commercial fishing boat captain who agreed to cooperate with the ongoing investigation and voluntarily became a confidential informant for the FBI in November 2013.  CI#1 was not paid for his information, and he does not have a

criminal record. CI#1 provided details pertaining to MISKE's commercial fishing vessels and drug trafficking.

7.    CI#2 was a Honolulu-based bookie prior to being charged with federal gambling violations. CI#2 agreed to cooperate with the ongoing investigation and voluntarily became a confidential informant. CI#2 was well-connected within Hawaii criminal organizations, and he has provided valuable information that was frequently corroborated through investigation and information provided by other sources. CI#2 provided details pertaining to MISKE's commercial fishing vessels and drug trafficking.

8.    CI#3 grew up in Hawaii, and he socialized with friends and associates of MISKE. CI#3 agreed to cooperate with ongoing investigations and voluntarily became a confidential informant in 2012. CI#3 has provided valuable information that was frequently corroborated through investigation and information provided by other sources. CI#3 provided details pertaining to MISKE's businesses and associates.

9.    CI#4 had known MISKE for many years; CI#4 and MISKE were both involved in the distribution of narcotics at the same time in Hawaii. CI#4 agreed to cooperate with ongoing investigations and voluntarily became a confidential informant. CI#4 has a criminal record, to include drug trafficking charges. CI#4 has not been paid for information, and some of his information has been corroborated

4

through investigation and information provided by other sources. CI#4 provided details pertaining to MISKE's associates and drug trafficking.

10. CI#5 was a Honolulu businessman who ran a large pest-control business. CI#5 agreed to cooperate with the ongoing investigation and voluntarily became a confidential informant for the FBI in 2015. CI#5 does not have a criminal record, and he has not been paid for information. CI#5 provided details pertaining to MISKE's businesses.

11. CI#6 was the operations manager for MISKE for approximately 10 years. CI#6 agreed to cooperate with the ongoing investigation and voluntarily became a confidential informant for the FBI in 2015. CI#6 does not have a criminal record, and he has not been paid for information. CI#6 provided details pertaining to MISKE's businesses and associates.

12. Your affiant requests to keep the referenced CIs' names' confidential due to their cooperation in this ongoing investigation. Your affiant believes the disclosure of the CIs' names' would jeopardize the investigation and potentially the CIs' safety.

**Cooperating Witnesses (CWs)**

13. CW#1 was briefly employed by MISKE in 2014. CW#1 had direct contact with MISKE and observed the day-to-day operations at MISKE's businesses. CW#1 agreed to cooperate with the ongoing investigation and voluntarily provided

information to the FBI. CW#1 was not paid for information, and he provided details pertaining to MISKE's businesses.

14.    CW#2 lived in Honolulu, Hawaii, and he was a client of MISKE's business in 2015. CW#2 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI. CW#2 was not paid for information, and he provided details pertaining to MISKE's businesses.

15.    CW#3 was a federal government employee who lived adjacent to one of MISKE's investment properties; CW#3 had direct interactions with MISKE. CW#3 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI. CW#3 was not paid for information, and he provided details pertaining to MISKE.

16.    CW#4 was previously stationed in Hawaii with the US Navy. CW#4 was assaulted by MISKE at MISKE's nightclub. CW#4 agreed to cooperate with the ongoing investigation and voluntarily provided information to the FBI. CW#4 was not paid for information, and he provided details pertaining to MISKE and MISKE's associates.

17.    Your affiant requests to keep the referenced CWs' names' confidential due to their cooperation in this ongoing investigation. Your affiant believes the disclosure of the CWs' names' would jeopardize the investigation and potentially the CWs' safety.

## BACKGROUND ON MICHAEL MISKE

18.    For more than ten years, FBI Honolulu has received information from various Cooperating Witnesses (CWs), Confidential Informants (CIs) and law enforcement partners that Michael MISKE was involved in drug trafficking, gambling, extortion and that MISKE utilized multiple Hawaii businesses to launder money. Based on the information provided, FBI Honolulu opened an investigation into the alleged criminal activity of Michael MISKE.  By way of background, Michael MISKE, his arrest record and his numerous businesses are identified below:

**Name:**              Michael John Miske, Jr.
**Date of Birth:**     15 February 1974

**Arrest Record:**

> 6/9/2013 – Excess Speeding
> 5/24/2013 – Assault 2, Criminal Property Damage 2
> 1/30/2013 – Assault 2
> 9/27/2007 – Harassment
> 11/7/2005 – Abuse Family
> 6/25/2000 – Violate Protection Order
> 6/23/1995 – Assault 1, Speeding, Kidnapping
> 4/28/1995 – Fraudulent Use of Credit Card, Theft 3; Theft 2
> 2/1/1994 – Theft 2
> 8/11/1993 – DWOL

**MISKE's Active Businesses:**

1. Palekaiko Beachboys Club, Inc.
2. Kama'aina Termite and Pest Control, Inc.
3. Kama'aina Plumbing Company LLC
4. Certified Termite & Pest Management LLC
5. Certified Pest Management, Inc.
6. Hawaii Partners LLC

   7. Kama'aina Solar Solutions LLC
   8. Kamaaina Capital LLC

**MISKE's Inactive Businesses:**

   1. The Tint Shop Incorporated
   2. Pestco Group Inc.
   3. The Tint Shop and Safety Films LLC
   4. Kama'aina Termite, Kona LLC
   5. Kama'aina Rolloffs LLC
   6. Leverage Entertainment LLC
   7. North Shore Juice LLC

## PROBABLE CAUSE

### MISKE's Dealing in Controlled Substances

19.    On November 7, 2013, CI#1 reported that MISKE was a "dangerous guy" who owned M Nightclub as well as a commercial long-line Fishing Vessel (FV) named Rachel.  MISKE utilized FV Rachel and another vessel, FV Kraken, to transport Methamphetamine into Hawaii.  Sometime in August, 2013, FV Rachel transported Methamphetamine from California to Hawaii.  Approximately 40 miles off the coast of Hawaii, FV Rachel attached a large amount of Methamphetamine to a Radio Frequency (RF) buoy and dropped the drugs into the ocean.  Later, other unidentified FVs used the RF transmissions to locate the Methamphetamine and transport the drugs into Hawaii.  On November 13, 2013, CI#1 reported that Alfredo CABAEL was a good friend of MISKE's who does MISKE's "dirty work" (CI#1 further clarified "dirty work" to mean illegal activity).  CABAEL was also the owner's rep for FV Rachel.  On

December 10, 2013, CI#1 reported that FV Kraken was recently boarded by law enforcement personnel and all of the "fish compound" was seized. In addition, CABAEL's vehicle was searched, and a gun was seized.

20.     On April 27, 2014, CI#2 reported that MISKE's FV Rachel had recently traveled to California for the sole purpose of picking-up a dog. When FV Rachel returned to Honolulu, Hawaii, the crew did not off-load any fish. CI#2 questioned why anyone would spend so much money on diesel to bring a dog on a FV from California rather than paying significantly less money to transport a dog on a plane. CI#2 advised MISKE ran his commercial fishing operation like a "gangsta" rather than a typical FV owner.

21.     On March 4, 2015, CI#3 reported that MISKE, the owner of M Nightclub and Kama'aina Termite and Pest Control (KTPC), approached CI#3 and requested CI#3 assist MISKE register FV Rachel under a name disassociated with MISKE. MISKE advised there was too much attention from the Coast Guard on his boat while it remained registered to MISKE. MISKE stated he had already registered M Nightclub under someone else's name to avoid law enforcement attention. At the time, MISKE would not provide CI#3 with MISKE's contact information; MISKE instructed CI#3 to contact his partner, Jason YOKOYAMA, and YOKOYAMA would notify MISKE.

22.     On May 24, 2015, CI#4 reported that Wayne MILLER was MISKE's "number one guy" who was in charge of MISKE's drug distribution network, and Russell MASCOTO was MISKE's "number two."

23.     On September 8, 2015, your affiant obtained Vessel Monitoring System (VMS) data from the National Oceanic and Atmospheric Administration (NOAA). The VMS data contained historical location information pertaining to FV associated with MISKE, including FV Rachel and FV Kraken. Your affiant reviewed the VMS information in an effort to corroborate the information previously provided by CI#1 and CI#2. Upon review of the VMS data, it appeared that FV Rachel left its' port in Honolulu, Hawaii on approximately July 15, 2013. FV Rachel traveled directly to Ventura, California where she stayed in port for three days before returning to Honolulu, Hawaii where she arrived on August 26, 2013.

**Miske's Businesses**

24.     On October 10, 2014, CW#1 reported that MISKE owned the following businesses:

a.     Kama'aina Termite and Pest Control (KTPC)

b.     Kama'aina Plumbing (KP)

c.     Kama'aina Solar (KS)

d.     M Nightclub

e.    Rowbar

f.    Commercial fishing operations

According to CW#1, KTPC was MISKE's primary business; KTPC had

approximately three trucks used to provide fumigation services to residential and

commercial customers.  MISKE complained that fumigations were not very

profitable.  KP was operated by a relative of MISKE; the company only had a few

employees, and they did not handle many projects.  KS was also a small,

unprofitable business.  M Nightclub was in an expensive location, yet the crowds

were small, and CW#1 estimated the bar was not able to generate significant profit.

MISKE owned a commercial fishing operation utilizing FV Rachel.  While

MISKE likely spent about $1,000,000 on Rachel, MISKE had no personal interest

or experience in the fishing industry.  MISKE appeared to have a significant

amount of money.  MISKE owned various properties, and he was building a large

ocean-front house in Portlock, Hawaii.  MISKE had multiple luxury vehicles

stored in his warehouses, and he was able to lease expensive business locations.

CW#1 had previously been a bar-owner and commercial fisherman.  Based on

CW#1's business experience, CW#1 determined MISKE must have an illegitimate

means of income to support his expensive lifestyle.  CW#1 reported that KTPC

and MISKE's other business could not generate as much money as MISKE spends.

25.     On March 19, 2015, CI#5 reported that MISKE owned KTPC.  KTPC was primarily a termite fumigation business.  Due to the poison gas (Vikane) that was used for fumigations, MISKE was required to comply with a number of regulations pertaining to the use and transportation of Vikane.  MISKE appeared to violate numerous regulations, and CI#5 did not know how MISKE was able to pass State inspections.  Based on CI#5's experience, it would be unlikely that a fumigation business could generate more than 10 percent profit annually.  CI#5 estimated KTPC's annual gross sales to be approximately $2.5 million allowing a maximum of $250,000 profit.  In addition to standard operating expenses, MISKE paid his employees significantly higher wages than his competitors, he purchased expensive company vehicles and he paid for costly and frequent advertisement.  Yet, MISKE drove exotic cars, purchased expensive real estate and maintained an overall "flashy lifestyle." Based on the size of KTPC and the manner in which MISKE operated the business, CI#5 reported MISKE's apparent profit was "impossible."  Thus, CI#5 stated that MISKE must have a source of significant income other than KTPC.


**Miske's Interference of Commerce by Threats or Violence**

26.     On March 19, 2015, CI#5 reported that approximately 10 years ago, MISKE tried to publicly intimidate and threaten CI#5 at the Honolulu, Costco in an attempt to stop CI#5 from competing against MISKE in the fumigation business.

MISKE stated he heard CI#5 was "talking trash about [KTPC]." MISKE continued to berate CI#5 until nearby security guards contacted the Honolulu Police Department for assistance. MISKE warned CI#5 to stop competing for KTPC's business or MISKE would "slash CI#5's tents." MISKE also threatened that he knew where CI#5 lived. Later that night, one of CI#5's fumigation tents was slashed. CI#5 reported that MISKE, or MISKE's "guys", continued to slash CI#5's tents until they caused about $50,000 in damage. In addition to the property damage caused by MISKE, one of the slashed tents had been on a zero-lot-line residence in Kailua, Hawaii. When the tent was slashed, the Vikane gas leaked into the residence next door and two females had to go to the hospital after breathing the poison gas. In addition to CI#5, MISKE was known to use threats and violence against numerous other competitors. CI#5 recalled a time when MISKE discovered that a Terminix (national pest control company) salesman (T1[1]) was showing potential clients negative reviews of KTPC. MISKE contacted T1 and pretended he was a homeowner looking to purchase Terminix services. When T1 arrived at the residence specified by MISKE, two of MISKE's guys pulled T1 into the residence and brutally beat him.

27.    On May 19, 2015, CW#2 reported that he recently hired KTPC to fumigate his van. Following the fumigation services, KTPC was unclear about the pesticides utilized during treatment of the van. CW#2 questioned KTPC and

---

[1] Law enforcement personnel have not yet been able to identify T1's identity or locate police

demanded a letter clarifying the chemicals used; CW#2 also notified KTPC he was

considering speaking to the Environmental Protection Agency (EPA) about KTPC's

business practices.  MISKE, the owner of KTPC, contacted CW#2 by phone and

stated, "Listen white boy, you're not fucking from Hawaii.  I'll take care of you and

your van right now."  MISKE continued by threatening he would "beat the shit out of

you [CW#2] right now."  MISKE called CW#2 a second time and asked, "Do you want

to disappear in Hawaii?  It's not like the mainland; things happen here."

28.    On May 20, 2015, CW#3 reported that approximately five years ago,

CW#3 was renovating his residence which adjoined an investment property owned by

MISKE.  MISKE was the owner of KTPC, and CW#3 frequently saw KTPC trucks

parked in the driveway next door.  One day, MISKE noticed that CW#3 had placed

construction waste near the street to await trash pick-up.  MISKE was angry that the

trash was near MISKE's property line.  MISKE approached CW#3 and asked, "Do you

know who I am?"  MISKE demanded CW#3 move the trash and threatened CW#3 by

stating, "If you don't move it, I have guys who will make it nasty for you."  CW#3

recalled MISKE's demeanor and actions to be "thug-like."

29.    On September 29, 2015, CI#6 reported that MISKE utilized a group of

guys to provide "muscle" (your affiant further understands the term "muscle" to mean

individuals used for protection, extortion and violence).  CI#6 identified some of

---

reports pertaining to T1's assault.

14

MISKE's muscle to be Russell MASCOTO, John STANCIL, Alfredo CABAEL, Mike BUNTENBAH and Wayne MILLER.  MISKE also wanted to be armed with a handgun despite MISKE's felony criminal record.  On multiple occasions, MISKE asked CI#6 to purchase a handgun for MISKE.  CI#6 did not want to face charges for purchasing a weapon for a felon, so CI#6 refused to comply with MISKE's request. Despite CI#6's refusal, MISKE was able to obtain a handgun from another KTPC employee, Richard MACGUYER.

30.    On October 8, 2015, CI#6 reported that MISKE previously assaulted a Terminix salesman (T1) for providing potential clients with bad reviews of KTPC.  At a staff meeting one morning, CI#6 recalled Elton SANTOS (KTPC salesman) informed MISKE about T1's sales tactic.   MISKE was angry when he heard SANTOS' story, and he eventually discovered who T1 was.  Several weeks later, CI#6 heard that MISKE and some of his "boys" located T1 and brutally beat him.  CI#6 asked CABAEL and Andi KANEAKUA (KTPC employee) if T1 had been assaulted by MISKE.  CABAEL confirmed T1 had been beaten for what he said about KTPC. CABAEL stated that T1 "won't be talking about KTPC anymore."  CI#6 also recalled talking to one of MISKE's employees (E1) who assisted with MISKE's commercial fishing operation.  E1 told CI#6 that when MISKE heard a competing fishing operation was offering lower prices on fish, MISKE had his guys assault the competitor and force him to raise fish prices.

15

31.     On October 9, 2015, CW#4 reported that he previously visited MISKE's club, M Nightclub in August 2012.  Following an evening of food and drinks, CW#4 received a bill from the waitress that included an extra charge.  CW#4 showed the error to the waitress and asked for a corrected bill.  When MISKE heard about CW#4's request, MISKE sent seven or eight security personnel to CW#4's table.  They pulled CW#4 from the table and escorted him to the rear of the club while repeatedly striking CW#4 in his side.  CW#4 was placed in a chair across from MISKE while the security personnel stood by.  MISKE demanded CW#4 pay the bill, "or else."  CW#4 stated that he had already been physically assaulted, so he questioned if "or else" meant CW#4 would be killed.  MISKE did not respond but continued to stare at CW#4.  CW#4 took the bill and wrote "fuck security."  MISKE observed what CW#4 wrote and proceeded to nod at his security personnel.  The nod prompted the security personnel to begin assaulting CW#4 once again.  CW#4 was able to escape by running outside the building.  Eventually, another male who appeared to be an M Nightclub employee, was able to catch-up with CW#4 and punch CW#4 in the face.  CW#4's tooth was knocked out by the punch, and CW#4 fell to the floor.  Bystanders helped CW#4 escape, and he was transported to Tripler Army Medical Center (TAMC).  Due to the assault, CW#4 incurred $5,000 in medical costs, primarily to replace his tooth.  CW#4 reported the incident to HPD and hired an attorney (JW) in an effort to recoup his medical expenses.  Initially, JW sought to bring a civil case against MISKE and M

Nightclub based on the assault of CW#4.  Later, JW contacted CW#4 and explained he would no longer proceed with the civil case against MISKE.  JW implied that MISKE was a dangerous individual engaged in organized crime.  JW believed he would be in danger if he continued to represent victims of MISKE's violent actions, especially as JW resided on Oahu.

### MISKE's Transmission of Wagering Information

32.    On November 24, 2014, CI#3 reported that MISKE, the owner of M Nightclub owed $40,000 in gambling losses to a Honolulu bookie that MISKE refused to pay.

33.    On June 29, 2015, CI#2 reported that Nathan THORRELL was employed by MISKE.  THORELL told CI#2 that he and MISKE's associate, Mike MALONE aka BUNTENBAH won a lot of money sports betting during football season.  On October 10, 2015 CI#2 reported that THORRELL contacted CI#2 and asked if CI#2 could take an $8,000 bet on the Patriots/Cowboys game the following day.  THORRELL advised the bet was on behalf of the "Kama'aina guy"; CI#2 understood THORRELL was referring to MISKE, the owner of KTPC.

34.    On October 8, 2015, CI#6 reported that MISKE and many of his associates were involved in gambling.  MISKE would hold a meeting each morning at KTPC; during the meeting, MISKE and his employees would discuss sports bets.

MISKE would complain about losing a $10,000 bet on a football game. SANTOS once used $10,000 cash he collected for a number of KTPC fumigation projects to place sports bets; SANTOS lost the bets and thus owed MISKE $10,000. MACGUYER eventually provided MISKE with $10,000 cash to cover SANTOS' loss. MACGUYER appeared to be the "house" through which MISKE, SANTOS and MISKE's other employees placed wagers. Cash pay-outs and collections were often conducted during KTPC meetings.

### MISKE's Telephonic Threats toward Honolulu Police Department Officers

35.    On or about November 13, 2015, Honolulu Police Department (HPD) officers attempted to initiate a traffic stop on MISKE's vehicle for a traffic violation. MISKE refused to stop for the officers and fled from the area. MISKE was positively identified by the officers as the driver of the vehicle. On November 14, 2015, HPD officers attempted to locate MISKE at M Night Club as a result of his unwillingness to turn himself in to authorities on charges for refusing to obey a lawful order to stop. The officers asked security staff if they could speak with MISKE. Security staff replied that MISKE was inside and that they would retrieve him for the officers. However, security staff returned without MISKE and explained that he was not present. In addition, one of the security staff intentionally blocked the entrance and denied entrance to the officers. Officers eventually surmised that MISKE left the night

club through a rear exit.  One of the officers present at the night club received a phone call on his personal cellular telephone from a male a short time later.  The male caller identified himself as MISKE.  MISKE made the following remarks: "I can press charges just as much as you can... Don't go throwing your weight around...I can go to the top of the food chain, you'll see, [HPD officer's name]...You going get me for a traffic warrant?  Big deal.  I'll pay that all day...Don't you go to my place of business and act the fool...I swear I'll have everyone over there put a TRO on you...You better be careful of the choices you made [HPD officer's name]...Don't even make this a big deal."

**Analysis of MISKE's Cellular Phones**

36.    On September 29, 2015, CI#6 reported that MISKE always carried multiple phones, and he was frequently changing numbers.  CI#6 used to manage the AT&T account for KTPC, and MISKE often asked CI#6 to activate new phone numbers for MISKE.  MISKE also paid his employees and associates to purchase and activate phones under their own names, which they subsequently provided to MISKE for MISKE's personal use.  CI#6 recalled MISKE researching encrypted phones and ordering a box of Blackberry phones from China.  Most of MISKE's phones were Smartphones, but MISKE also carried a cheap, flip-style phone.  CI#6 once noticed that the individuals who appeared to provide "muscle" for MISKE also had flip-style

19

phones similar to MISKE's.  By using multiple phones and frequently changing

numbers, MISKE sought to minimize the risk that law enforcement personnel would be

able to listen to his phone calls.  CI#6 did not know all of MISKE's phone numbers,

but he knew MISKE utilized (808) 729-3034, (808) 341-4299 and (808) 725-9658.

    37.    Based on CI reporting and an extensive review of telephone records, it

appeared that MISKE routinely switched-out his use of cellular telephones.  MISKE's

phones were never subscribed to by MISKE himself; he only used phones that were

subscribed to by other individuals, fictitious names or KTPC.  Toll record analysis

revealed that upon acquiring a new phone, MISKE initially produced a high volume of

telephonic activity.  However, after several months, telephonic activity would begin to

decrease, and MISKE would obtain a new phone number.  Based on investigation to

date, it was determined that MISKE used at least five phones between September 2014

and October 2015.  The five phone numbers were as follows:

 **(808) 725-9658; T-Mobile**

According to T-Mobile, cellular telephone number (808)725-9658 was subscribed

to by "John Naughton", with no address provided. Toll analysis revealed that

during the period of September 2014 to April 2015, telephonic activity for (808)

725-9658 decreased over time, and in May 2015 activity ceased.

**(808) 341-4299; Verizon Wireless**

According to Verizon Wireless, cellular telephone number (808) 341-4299 was subscribed to by "Solana Grover", 1379 13th Avenue, Honolulu, Hawaii. Toll analysis revealed that during the period of September 2014 to February 2015, telephonic activity for (808) 341-4299 increased from September to October 2014, then decreased as of December 2014. According to telephone records, activity ceased as of late February 2015.

**(808) 729-3034; AT&T**

According to AT&T, cellular telephone number (808) 729-3034 was subscribed to by "John Naughton", 1067 Kapiolani Blvd, Honolulu, Hawaii. Toll analysis revealed that during the period of October 2014 to July 2015, telephonic activity for (808) 729-3034 increased over time, with the highest volume observed in February 2015. However, as of April 2015, telephonic activity significantly decreased. There were no outgoing calls from (808) 729-3034 as of late July 2015.

**(808) 439-5220; AT&T**

According to AT&T, cellular telephone number (808) 439-5220 was subscribed to by "Dayton Xelor", 765 Amana Street, Honolulu, Hawaii. Telephone records revealed (808) 439-5220 was activated on February 27, 2015. During the period

April to June 2015, there was a significant volume of telephonic activity, with the highest volume observed in June 2015; activity began to decrease as of July 2015.

**(808) 859-9890; AT&T**

According to AT&T, cellular telephone (808) 859-9890 was subscribed to by Kama'aina Termite and Pest Control, 940 Queen Street, Honolulu, Hawaii. Telephone records indicate (808) 859-9890 was activated on October 16, 2014. During the period of November 2014 to July 2015, there was minimal telephonic activity on (808) 859-9890 compared to the four phones referenced above. Toll analysis revealed (808) 859-9890 was in contact with a few of MISKE's known girlfriends, but it appeared MISKE did not use (808) 859-9890 to contact any of the individuals identified by CIs as those who conducted "dirty work" for MISKE. Of the five referenced phones, (808) 859-9890 was the only phone registered to an entity directly connected to MISKE; it was also the only phone MISKE did not use to contact his known criminal associates.

**Table 1: Telephonic activity for the four cellular telephones used by MISKE
that were registered to alias names**

**September 2014 – September 2015**



38.    All of the phones referenced in the chart were used by MISKE, registered to alias names and had frequent contact with numbers subscribed to, or associated with, individuals reportedly involved in criminal activity.  In addition, many of MISKE's most frequent telephonic contacts were consistently with individuals identified by CIs as those who do MISKE's "dirty work."  Some of MISKE's frequent contacts were as follows:

**(808) 216-8829**

- This number was subscribed to by Certified Pest Management, Inc., owned by Ryan TERAMOTO, and had frequent contact with the four cellular telephones used by MISKE. On January 6, 2003, the FBI charged TERAMOTO for possession with intent to distribute 997 grams of cocaine. The FBI interviewed TERAMOTO in May 2000 regarding his knowledge of Miske. Teramoto advised he was involved in drug trafficking with MISKE, and MISKE would purchase one half of a kilogram of Cocaine per transaction with TERAMOTO.

**(808)753-0244 and (808)753-2049**

- These numbers were subscribed to by Russell MASCOTO and had frequent contact with the four cellular telephones used by MISKE. On September 7, 2000, the FBI arrested MASCOTO for possession with intent to distribute a controlled substance. While incarcerated, MASCOTO was again charged with possession with intent to distribute crystal methamphetamine in January 2002. MASCOTO's additional arrests from December 1997 to May 2015 include criminal property damage, assault, cruelty to animals, and vehicle theft. As previously referenced, multiple CIs reported that MASCOTO was used by MISKE for "muscle" and drug distribution.

24

**(808) 233-9833**

- This number was subscribed to by Nathan QUINIOLA, also known as Nathan THORRELL, and had frequent contact with the four cellular telephones used by MISKE. According to CI#2, THORRELL was involved in internet sport gambling and "won a lot of money" last football season with BUNTENBAH, a close associate of MISKE. THORRELL also sought to place an $8,000 sports bet with CI#2 on behalf of MISKE.

**(808) 589-6244**

- This number was subscribed to by Sara TUFELE; however, according to CIs, it is used by Wayne MILLER, a close associate of MISKE. This number also had frequent contact with the four cellular telephones used by MISKE. In June 2005, the FBI arrested MILLER for the December 2001 armed robbery of the Windward Federal Credit Union located in Hawaii. MILLER was sentenced to 84 months incarceration. As previously referenced, multiple CIs reported that MILLER was used by MISKE for "muscle" and drug distribution.

**(808) 306-2926**

- This number was subscribed to by Capone's Ultimate Detail, Inc., owned by Michael VITOLO, and had frequent contact with three cellular telephones used by MISKE. VITOLO was arrested by the Drug Enforcement Administration (DEA) on August 8, 1997 for conspiracy to possess, with intent to distribute crystal methamphetamine. In addition, from 1982 to 1990, VITOLO was arrested in New York and New Jersey for various offenses including gambling, drugs, grand larceny, and criminal possession of a weapon.

**(808) 216-6795 and (808) 799-3229**

- These numbers were subscribed to by Kama'aina Termite and Pest Control and Maydeen Stancil, respectively; however, law enforcement databases indicated the numbers were used by John STANCIL. These numbers had frequent contact with four cellular telephones used by MISKE. STANCIL, MISKE and BUNTENBAH were arrested for the assault of Trent WILLIAMS in January 2013. STANCIL and MISKE were again arrested in May 2013 for assaulting a customer at MISKE's M Nightclub in December 2012. According to CI reporting, STANCIL is used by MISKE for "muscle".

**(808) 723-0960**

- This number is subscribed to by Defend, Inc., owned by Michael
  BUNTENBAH, and had frequent contact with two cellular telephones used
  by MISKE. According to criminal history records, BUNTENBAH, also
  known as Mike MALONE, was arrested by the DEA on drug charges. From
  1994 to 2014, BUNTENBAH was arrested multiple times for abuse of a
  family member and drunk driving. In addition, BUNTENBAH was arrested
  in January 2013 with MISKE and STANCIL for the assault of Trent
  WILLIAMS. According to the Honolulu Police Department (HPD) and CI
  reporting, BUNTENBAH was used by MISKE for "muscle" and drug
  trafficking.

**(808) 620-7061**

- According to law enforcement databases, this number was listed for Alfredo
  CABAEL, Jr. and was in contact with two cellular telephones used by
  MISKE. According to CI reporting, CABAEL was MISKE's "go to guy"
  who did MISKE's "dirty work." In March 2014, according to the US Coast
  Guard Investigative Service, CABAEL was the owner's representative for
  MISKE's FV Rachel. CABAEL's lengthy criminal record from August
  1990 to July 2015 include 30 arrests for abuse of a family member, reckless

driving, terroristic threatening, drunk driving, theft, criminal trespassing, and burglary.

39.     Based on my knowledge, training and experience, along with frequent communication with other law enforcement personnel, I know that individuals who engage in criminal activity often purchase multiple "drop-phones" to further their illegal conduct.  The drop-phones are un-attributable to the individual, in that they are not registered with the criminal's true identity.  To further protect their criminal behavior from being traced back to a particular phone number, subjects purchase new drop-phones and activate the line with a new phone number.  Many criminal subjects conduct their daily activities while carrying one phone for personal conversations with friends and family and an additional phone for criminal conversations.  Thus, individuals who engage in criminal activity often use more than one phone number at a time.  In addition, from my training and experience, I know that individuals who engage in criminal activity frequently use their cellular phone to place calls or send text messages to others within their criminal network.  The content of those communications often provides excellent evidence of the ongoing criminal activity and also identifies further subjects within the overall conspiracy.  Oftentimes, investigators are able to determine whether a phone is being actively used for ongoing criminal activity based on the analysis of frequent contacts.  Individuals who use a phone to conduct criminal activity often place calls or send text messages to multiple individuals

who possess lengthy criminal records and who are also targets of current criminal investigations.

40.    Based on the above factors, I believe there is probable cause that any cellular phone in the possession of MISKE would contain evidence pertaining to MISKE's pattern of racketeering activity.  On or about the afternoon of December 4, 2015, officers from the Honolulu Police Department plan to traffic stop and arrest MISKE for the aforementioned violation of refusing to obey a lawful order to stop.  I believe, at the time of MISKE's arrest, there is probable cause that MISKE will have a cellular phone(s) on his person.  Thus, your affiant believes there is probable cause that a search of MISKE's person will yield valuable evidence pertaining to his pattern of racketeering activity.   Your affiant believes that immediately notifying MISKE that a search was conducted will be detrimental to the ongoing investigation.  MISKE's awareness of the search would allow him the opportunity to further conceal his criminal activity from law enforcement.  In addition, the safety of CW's and CI's would potentially be jeopardized.  Therefore, your affiant requests to delay notifying MISKE that a search warrant was executed.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

41.    As described in Attachment B, this application seeks permission to search

for records that might be found in the cellular phones, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

42. *Probable cause.* I submit that if a computer or storage medium is found on MISKE's person, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that subjects who conspire to commit offenses of RICO and RICO Conspiracy keep web-enabled computer devices on their persons, in their vehicles, in their offices, or in their homes, or other readily accessible places. As stated above, MISKE uses email and text messages to communicate. Based on my knowledge, training, and experience, I know that text message and email communication could be sent through any web-enabled device such as a computer, tablet or cell phone.

    b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium,

deleted, or viewed via the Internet. Electronic files downloaded to a
storage medium can be stored for years at little or no cost. Even when
files have been deleted, they can be recovered months or years later
using forensic tools. This is so because when a person "deletes" a file
on a computer, the data contained in the file does not actually
disappear; rather, that data remains on the storage medium until it is
overwritten by new data.

c.  Therefore, deleted files, or remnants of deleted files, may reside in
free space or slack space—that is, in space on the storage medium that
is not currently being used by an active file—for long periods of time
before they are overwritten. In addition, a computer's operating
system may also keep a record of deleted data in a "swap" or
"recovery" file.

d.  Wholly apart from user-generated files, computer storage media—in
particular, computers' internal hard drives—contain electronic
evidence of how a computer has been used, what it has been used for,
and who has used it. To give a few examples, this forensic evidence
can take the form of operating system configurations, artifacts from
operating system or application operation, file system data structures,
and virtual memory "swap" or paging files. Computer users typically

31

do not erase or delete this evidence, because special software is
typically required for that task.  However, it is technically possible to
delete this information.

e.  Similarly, files that have been viewed via the Internet are sometimes
automatically downloaded into a temporary Internet directory or
"cache."

43.  *Forensic evidence.*  As further described in Attachment B, this application
seeks permission to locate not only computer files that might serve as direct evidence
of the crimes described on the warrant, but also for forensic electronic evidence that
establishes how computers were used, the purpose of their use, who used them, and
when.  There is probable cause to believe that this forensic electronic evidence will be
on any computer on MISKE's person:

a.  Data on the storage medium can provide evidence of a file that was
once on the storage medium but has since been deleted or edited, or of a
deleted portion of a file (such as a paragraph that has been deleted from a
word processing file). Virtual memory paging systems can leave traces of
information on the storage medium that show what tasks and processes
were recently active.  Web browsers, email programs, and chat programs
store configuration information on the storage medium that can reveal
information such as online nicknames and passwords.  Operating systems

can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries,

logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

44.      *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of the facilities for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally

34

speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the

search site.  The vast array of computer hardware and software available

makes it difficult to know before a search what tools or knowledge will

be required to analyze the system and its data.  However, taking the

storage media off-site and reviewing it in a controlled environment will

allow its examination with the proper tools and knowledge.

    c.    *Variety of forms of electronic media.*  Records sought under this

warrant could be stored in a variety of storage media formats that may

require off-site reviewing with specialized forensic tools.

45.    *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), when persons executing the warrant conclude that it would be impractical

to review the media on-site, the warrant I am applying for would permit seizing or

imaging storage media that reasonably appear to contain some or all of the evidence

described in the warrant, thus permitting its later examination consistent with the

warrant.  The examination may require techniques, including but not limited to

computer-assisted scans of the entire medium, that might expose many parts of a hard

drive to human inspection in order to determine whether it is evidence described by the

warrant.

## REQUESTED SEARCH LOCATIONS

46.    Based on the foregoing, I respectfully submit there is probable cause to

believe that Michael MISKE, together with other individuals, conspired to commit, and

36

has committed, the crimes of RICO and RICO Conspiracy, in violation of 18 U.S.C. §§ 1961 and 18 U.S.C. §§ 1962(d).  I further submit there is probable cause to believe that on the PERSON of MICHAEL MISKE, which is more particularly described in Attachment "A" hereto, contain presently located information and items pertaining to MICHAEL MISKE which items are more particularly described in Attachment "B" hereto, and which items constitute evidence of crimes, namely, violations of 18 U.S.C. §§ 1961 and 18 U.S.C. §§ 1962(d), property intended for use, or used in committing the foregoing offenses.

Respectfully Submitted,

AUSTIN KYLE JACKSON
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to
before me this 9 th day
of December 4 , 2015.

BARRY M. KURREN
United States Magistrate Judge
District of Hawaii

37